WINDMILL DISTRIBUTING COMPANY, L.P.,  :
    Plaintiff,                      :
                                :

v.                              :        CIVIL ACTION NO.
                                :        3:09-cv-40 (VLB)

HARTFORD FIRE INSURANCE COMPANY,  :
    Defendant.               :        September 24, 2010

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. #27] AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT [Doc. #35]

### I. INTRODUCTION

The Plaintiff, Windmill Distributing Company, L.P. ("Windmill"), brings this action for damages against the Defendant, Hartford Fire Insurance Company ("Hartford"). The Plaintiff alleges that the Defendant breached its duty, contained in the Plaintiff's insurance policy, to defend the Plaintiff in good faith against an underlying suit for damages that arose out of a traffic accident (First Cause of Action). The Plaintiff further alleges that the Defendant settled the underlying suit in bad faith in contravention of the Plaintiff's interests (Second Cause of Action). Currently pending before the Court are the Defendant's motion for summary judgment [Doc. #27], and the Plaintiff's cross-motion for summary judgment [Doc. #35].

For the reasons set forth below, the Defendant's motion for summary judgment is GRANTED, and the Plaintiff's cross-motion for summary judgment is DENIED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Windmill has its principal place of business in Long Island City, New York. Hartford, which has its principal place of business in Connecticut, issued a casualty insurance policy to Windmill for the period of December 31, 2004 to December 31, 2005 ("the Policy"). The Policy provided certain automobile liability coverage, including $2,000,000 for any one accident or loss subject to a prefunded deductible of $250,000 and additional fees of up to $25,000 for claim handling. Under the Liability Coverage section, the Policy provided that as part of the "right and duty to defend," Hartford "may investigate and settle any claim or 'suit' as [it] consider[s] appropriate." [Ex. A. at 2HFIC2702.] The Policy also contained a clause designating that

> [a]ll rights and duties of the Parties arising from or relating in any way to the subject matter of this Agreement shall be governed, construed and enforced in accordance with the law of the State of Connecticut, without regard to principles or rules of conflict of laws. Any legal action brought concerning any issues or disputes arising out of this Agreement must be brought exclusively in an appropriate state or federal court in Connecticut.

[Ex. B at 2HFIC2774.]

A liability claim under the Policy arose out of a motor vehicle accident on June 17, 2005, in which a 2004 Honda driven by Barbara Morris ("Morris") struck and injured Lorraine Rystedt ("Rystedt"), a pedestrian on the sidewalk of Cypress Hills Street in Queens, New York (the "Morris accident"). At the time of the Morris accident, Windmill's delivery truck, operated by Jorge Rodriguez ("Rodriguez"), was travelling on Cypress Hills Street near the intersection with Myrtle Avenue. There is conflicting testimony from witnesses to the Morris accident as to what extent, if any,

the delivery truck contributed to Morris losing control of her car, mounting the sidewalk, and striking and injuring Rystedt, but the police report from the accident indicates that the Windmill truck cut Morris off at the intersection.

On or about July 5, 2005, Hartford, as Windmill's insurer, was notified about the Morris accident. The case was assigned to Louis DeRossi ("DeRossi"), a Hartford claims adjuster who, in discharge of his duties, commenced an investigation and assessment of the case. During the course of his investigation, DeRossi obtained the police report of the Morris accident, which listed Morris as the registrant of the vehicle that struck Rystedt, and which did not indicate that the vehicle was, in fact, leased to Morris by HVT, Inc. ("HVT"). Based on the police report, DeRossi initially believed Morris to be the owner of the vehicle. However, on August 16, 2005, DeRossi spoke with a claims representative from GEICO, Morris's liability carrier, and learned that the vehicle was owned by HVT and leased to Morris.

On August 9, 2005, Rystedt filed suit (the "Rystedt action") in the Supreme Court of the State of New York, County of Queens, naming Morris, Windmill, Phoenix Beverages, Inc., and Rodriguez as defendants. For the sake of efficiency, with regard to the Rystedt action, the Court will refer to Windmill, Phoenix Beverages, Inc., and Rodriguez collectively as "the Windmill Defendants." The defense of the Windmill Defendants was initially handled by Attorney William Bonifati ("Bonifati") of the Law Offices of Stewart H. Friedman, and later by Attorney John Saville ("Saville") of the law firm Lewis Johs Avallone Avilles, LLP.

Bonifati deposed Rystedt, Morris, and Rodriguez. After Rystedt's deposition, Bonifati informed DeRossi that Rystedt would make an "excellent witness [who]

3

would leave a typical Queens jury with a most favorable impression." [Ex. T at 2HFIC1856.] Rystedt was a thirty-three year old kindergarten teacher who was walking her dog on the sidewalk at the time of the accident. After Morris's vehicle mounted the sidewalk, Rystedt was pinned underneath the car. As a result of the accident, she suffered serious physical injuries, which required nineteen days of hospitalization and knee surgery. Rystedt was also unable to work for a period of time and was confined to her bed and house for several weeks. In addition to a permanent disability of her left knee, Rystedt claimed medical bills of over $50,000 and lost wages of approximately $8,000.

After Bonifati deposed Morris, he reported that Morris testified that she had her cell phone with her on June 17, 2005, but that she was not using it at the time of the accident. Counsel for the Windmill Defendants made attempts to obtain Morris's cell phone records. The return date for the motion for authorization to obtain the records, however, was the day after Hartford ultimately settled with Rystedt, so no one from Hartford appears to have reviewed Morris's cell phone records from that day. The record in this case does not include the contents of these cell phone records. Morris also testified during her deposition that she swerved her car to avoid a "big white blur[]" approaching from her left when she lost control of her vehicle and struck Rystedt. Although her testimony could have been damaging to the Windmill Defendants, Bonifati reported that he did not believe Morris would make a "terribly good witness, nor would a jury be sympathetic towards her." [Ex. T at 2HFIC1858.]

Finally, after Bonifati deposed Rodriguez, he reported that Rodriguez would "only make a fair witness inasmuch as he is somewhat nervous, and . . . easily confused." [Ex. T at 2HFIC1859.] Furthermore, although Rodriguez gave some testimony favorable to the Windmill Defendants regarding the movement of the truck onto and down Cypress Hills Street, there were some inconsistencies in his description of how the Morris accident occurred that would likely not create a favorable impression on a jury.

As part of his duties in handling the claim surrounding the Morris accident, in May of 2007, DeRossi also participated in a loss transfer arbitration with GEICO, Morris's insurance provider, to determine whether GEICO was entitled to recoup any of the no-fault payments it had made for the Morris accident. As was the typical process for loss transfer arbitrations, DeRossi attended the arbitration without counsel. The arbitrator reviewed the comparative fault of Morris and the Windmill Defendants and determined that the Windmill Defendants were fifty percent responsible for the Morris accident.

After Saville took over the defense for the Windmill Defendants, he provided DeRossi with a pre-trial report dated December 14, 2006 in which he noted the deposition testimony taken by Bonifati and the conflicting witness statements, and presented a liability evaluation, a damages evaluation, a strategy, a verdict range, and the settlement status as of that date. Saville explained in the liability evaluation that, under the joint and several liability rule in New York, if the jury attributed even a small portion of the fault to the Windmill Defendants in the Rystedt action, they could be liable for any damages beyond that which Morris could pay. Morris's

GEICO policy had a $100,000 limit.  Saville noted, however, that if HVT were brought

into the case, the risk that Morris (with HVT) would be unable to pay her portion of

Rystedt's damages would be "lessened somewhat," [Ex. N at 2HFIC1816] because

under New York Vehicle and Traffic Law § 388:

> (1) Every owner of a vehicle used or operated in [New York] shall be
> liable and responsible for death or injuries to person or property
> resulting from negligence in the use or operation of such vehicle . . . by
> any person using or operating the same with the permission, express
> or implied, of such owner. . . .
> (3) [An owner's] liability under this section shall be joint and several.

Thus, if HVT had been a named Defendant in the Rystedt action, HVT would have

been vicariously liable for any of the damages apportioned to Morris that she was

unable to pay.  The risk that the Windmill Defendants, through joint and several

liability, would be responsible for anything other than their apportioned fault would

be lower as long as HVT was able to pay any damages attributed to Morris that she

was unable to pay.  However, there is no evidence in the record regarding HVT's

financial position or insurance coverage.

　　Bonifati had noted the "shock value" of the case because of "the unfortunate

way in which this accident occurred and the fact that the plaintiff was pinned under

[t]he automobile," [Ex. M, 2HFIC1864,] and Saville further reported that the potential

jury verdict could thus range upwards of $450,000 to $650,000.  Saville also noted

that Rystedt's counsel indicated that the official settlement demand was $500,000,

but that he would settle the case for $300,000, with $100,000, or one-third,

contributed from Morris's insurance provider GEICO (which was the total amount

available under the GEICO policy) and the remaining $200,000, or two-thirds,

contributed from the Windmill Defendants' insurance.  Saville stated that he

believed this settlement amount was "rather reasonable." [Ex. N at 2HFIC1821.] Saville indicated, however, that if HVT became a viable defendant, Rystedt's counsel would "certainly be looking more towards [HVT] for a greater contribution which would then decrease any settlement amount [Hartford] would have to contribute." [Ex. N at 2HFIC1821.] Assuming an apportionment of liability equally to both Morris and the Windmill Defendants, Hartford could have settled theoretically for $150,000 at this time, a savings of $75,000 from the ultimate settlement amount.

In the course of his preparation for trial, Saville also engaged an accident reconstruction expert, but Saville testified in his deposition that he had not decided whether he would have called the expert as a witness at trial. Saville testified that, although the expert's initial report was mostly favorable to the Windmill Defendants, there remained inconsistent and conflicting witness statements, a conflicting story between Morris and Rodriguez, and a police report stating that Windmill's truck cut off Morris at the intersection. Ultimately, Saville stated that he did not believe the expert's report was going to "put [them] over the hump and bring in a defense verdict." [Saville Depo. at 166:11-14.]

Saville also suggested adding HVT as a defendant in the Rystedt action to Rystedt's counsel, and in an amended complaint dated December 18, 2006, Rystedt named HVT as a party defendant. HVT subsequently filed a motion to dismiss, contending that the Graves Amendment precluded recovery from a leasing company brought into an action after August 10, 2005. The Graves Amendment, 49 U.S.C. § 30106, provides in relevant part:

> (a) In general. – an owner of a motor vehicle that rents or leases the vehicle to a person . . . shall not be liable under the law of any State . . .

> by reason of being the owner of the vehicle . . . for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of rental or lease . . .
>
> (c) Applicability and effective date. – Notwithstanding any other provision of law, this section shall apply with respect to any action commenced on or after the date of enactment of this section [August 10, 2005] without regard to whether the harm that is the subject of the action, or the conduct that caused the harm, occurred before such date of enactment.

The Graves Amendment is silent on the question of when a party has to be brought into an action, speaking only as to when the action had to have been commenced. HVT's argument was consistent with the New York Appellate Division, Second Department's decision in <u>Jones v. Bill</u>, 825 N.Y.S. 2d 508 (2006), which held that claims against a leasing company interposed in an automobile negligence action after the August 10, 2005 enactment date were preempted by the Graves Amendment even if the action itself was commenced prior to the enactment date.

Because of the decision of the Appellate Division, Second Department in <u>Jones v. Bill</u> and the fact that Rystedt did not name HVT as a defendant until December 18, 2006, the trial court granted HVT's motion to dismiss on August 28, 2007. Saville timely filed a notice of appeal of HVT's dismissal. The New York Court of Appeals granted leave to appeal the <u>Jones v. Bill</u> case on October 23, 2007. On June 5, 2008, the Court of Appeals unanimously reversed the lower court opinion, holding that as long as the action was filed prior to the effective date of the Graves Amendment on August 10, 2005, a leasing company could be held vicariously liable for the negligence of its lessee regardless of when the leasing company was brought into the case. See <u>Jones v. Bill</u>, 10 N.Y.3d 550, 554 (2008).

After HVT was dismissed from the Rystedt action, Rystedt moved to restore the case to the trial calendar. The trial court granted Rystedt's motion and, as a result, restored the case to the trial calendar for early February 2008. Subsequently, Saville filed a motion with the Appellate Division, Second Department seeking a stay of the trial pending an appeal of the trial court's decision dismissing HVT, as well as an enlargement of time to perfect the appeal. On February 1, 2008, the Appellate Division, Second Department granted an enlargement of time to perfect the appeal, but declined to stay the trial pending that appeal. Finally, although Windmill expressed to Hartford that it adamantly opposed settling the Rystedt action, on February 4, 2008, DeRossi settled the case with Rystedt for $325,000, with a $225,000 contribution from Windmill. The remaining $100,000 was contributed by GEICO, representing the full limit of Morris's insurance policy. It is unclear from the record why the final settlement amount increased to $325,000 from Rystedt's earlier settlement demand of $300,000 in December 2006. At the time of the settlement, the Appellate Division, Second Department's decision in <u>Jones v. Bill</u> was still binding law as to the Rytedt action. The settlement was paid out of Windmill's $250,000 prefunded deductible, and Hartford also charged Windmill $25,000 in claims handling fees.

Summarizing the chronology of events, the accident occurred on June 17, 2005 and Hartford learned of it on July 5, 2005. Sometime shortly thereafter, DeRossi was assigned to adjust the claim. Suit was filed in the Supreme Court of the State of New York on August 9, 2005. The record does not reflect when the Windmill Defendants were served or when Hartford received the complaint and

learned who was named as a defendant. The day after the lawsuit was filed, on August 10, 2005, the Graves Amendment was enacted and made effective as of the date of its enactment. On August 16, 2005, DeRossi learned that HVT was in fact the owner of Morris's vehicle. Prior to the effective date of the Graves Amendment on August 10, 2005, New York law did not immunize the lessor of a motor vehicle from vicarious liability for the negligence of its lessee. Therefore, DeRossi would have had no way of knowing before the Graves Amendment was enacted that suit against HVT would be foreclosed. On November 28, 2006, the New York Appellate Division, Second Department held in Jones v. Bill, 825 N.Y.S.2d 508 (2006), that claims against a leasing company interposed in an automobile negligence action after the August 10, 2005 enactment date were preempted by the Graves Amendment even if the action itself was commenced prior to the enactment date. On December 14, 2006, Hartford's litigation counsel stated in a pre-trial report that Rystedt's settlement demand of $300,000 was "rather reasonable," and further noted that bringing HVT into the case would reduce Windmill's exposure. At the prompting of Hartford's litigation counsel, HVT was brought into the suit as a defendant on December 18, 2006, notwithstanding the Jones v. Bill decision. In May of 2007, a loss transfer arbitration assessed liability for the accident equally among the Windmill Defendants on one hand and Morris on the other. On August 28, 2007, the action against HVT was dismissed by the Supreme Court, citing the Appellate Division, Second Department's decision in Jones v. Bill. Hartford appealed that dismissal by notice of appeal dated September 20, 2007. On October 23, 2007, leave was given by the Court of Appeals to appeal the Appellate Division, Second

Department's decision in <u>Jones v. Bill</u>. Upon motion by Rystedt, the Supreme Court restored the Rystedt action to the trial calendar and set trial for early February 2008. The Appellate Division, Second Department refused to stay trial in the Rystedt action pending the outcome of the appeal of HVT's dismissal. Hartford settled the Rystedt action on the eve of trial on February 4, 2008 for a contribution of $225,000. <u>Jones v. Bill</u> was decided by the Court of Appeals four months later on June 5, 2008. The Court of Appeals reversed the Appellate Division, Second Department's ruling and held that the Graves Amendment did not preempt vicarious liability claims against a leasing company interposed after the August 10, 2005 enactment date so long as the action was filed prior to the enactment date. <u>See</u> <u>Jones v. Bill</u>, 10 N.Y.3d 550, 554 (2008).

Windmill filed a two-count Complaint in this Court on January 12, 2009. Windmill first alleges that Hartford breached its duty to defend Windmill by settling the Rystedt action because Hartford failed to ensure that the lessor of Morris's vehicle was a named defendant at the start of the Rystedt action, failed to obtain Morris's cell phone records for the date of the accident, and failed to obtain an official accident reconstruction report from the expert (First Cause of Action). Windmill secondly claims that Hartford's decision to settle the Rystedt action was made in bad faith and that the settlement was in contravention of the Windmill's interests (Second Cause of Action).

Hartford filed a motion for summary judgment on November 16, 2009, claiming that the undisputed facts demonstrate that Windmill cannot sustain its burden of proving that in settling the Rystedt action, Hartford acted in bad faith or

that the settlement was made in gross disregard of the Windmill's interests. Windmill filed a cross-motion for summary judgment on December 15, 2009.

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard for Summary Judgment

"The standards governing summary judgment are well-settled." <u>Ford v. Reynolds</u>, 316 F.3d 351, 354, 379 (2d Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." <u>Ford</u>, 316 F.3d at 354. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo. Inc., v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

The Court must "construe the evidence in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in its favor." Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).

## B. Conflict of Laws

As a starting point for both claims, Hartford first contends that a conflicts analysis is necessary because this is a diversity case, and although Hartford has its principal place of business in Connecticut, the majority of the activity regarding the underlying claim took place in New York. Hartford therefore contends that New York law applies to the present case. Windmill, however, argues that the Claim Agreement, which the parties executed, expressly provides that Connecticut law applies to the present action. The Claim Agreement states that "[a]ll rights and duties of the Parties arising from or relating in any way to the subject matter of this Agreement shall be governed, construed and enforced in accordance with the law of the State of Connecticut, without regard to principles or rules of conflict of laws." [Ex. B at 2HFIC2774.]

"'In diversity cases, federal courts look to the laws of the forum state in deciding issues regarding conflicts of law.' . . . Under Connecticut law, 'parties to a contract are generally allowed to select the law that will govern their contract.'" Sedona Corp. v. Open Solutions, Inc., 249 F.R.D. 19, 25 n.1 (D. Conn. 2008) (citations

omitted); see also Elgar v. Elgar, 238 Conn. 839, 845 (1996) (Connecticut law "give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith"). Here, the parties explicitly selected Connecticut as the forum state and agreed that the laws of Connecticut govern their respective rights under the Claim Agreement. [Ex. B at 2HFIC2774.] Hartford does not claim a lack of good faith by Windmill in making this choice of law, nor does it claim any ambiguity in the provision. As such, Hartford's argument that New York law applies in this case is unavailing. Connecticut substantive law applies.

### C. Breach of Duty to Defend (First Cause of Action)

In its First Cause of Action, Windmill claims that Hartford breached its duty to defend by failing to conduct discovery diligently prior to settling the Rystedt action. Windmill asserts that had Hartford exercised the requisite degree of care and diligence in investigating and handling the Rystedt claim, DeRossi would have discovered that Morris's vehicle was leased through HVT at the outset and would have obtained Morris's cell phone records prior to settling. Further, Windmill contends that had DeRossi discovered HVT's involvement in the case, Rystedt certainly would have named HVT as a defendant in the original complaint, which would have obviated the problems the case later encountered regarding the applicability of the Graves Amendment and significantly lessened the joint and several liability risk to Windmill had Morris not been able to pay her share of the damages. Finally, with the much lower risk of joint and several liability, and based upon the belief that it would have obtained a complete defense verdict regardless, Windmill contends that had DeRossi discovered HVT at the outset, there would have

14

been no justification for him to settle the case with any of the $250,000 Windmill prefunded deductible.

Hartford, on the other hand, contends that it was not "standard procedure" for DeRossi to pull a DMV report to definitively determine the owner of vehicles involved in accidents with Hartford's insureds when he had a legible police report indicating the registrant of the vehicle. Hartford further contends that even if DeRossi had identified HVT as a potential defendant, his knowledge would not have guaranteed that Rystedt's counsel would have included HVT as a defendant in the initial complaint. Finally, Hartford contends that Windmill, by asserting that it would have obtained a complete defense verdict in the underlying case, precludes its claim that any negligence on the part of DeRossi in failing to identify HVT as a potential defendant caused Windmill any harm. Accordingly, Hartford claims that Windmill has not presented any triable issues of material fact as to whether it was reasonable for DeRossi not to have determined until after August 10, 2005 that Morris's car was actually leased through HVT.

The case law in Connecticut centers on cases in which insurers have refused to defend a case altogether, rather than taking on the defense of their insureds but conducting an inadequate defense. See, e.g., Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457 (2005); R.T. Vanderbilt, Inc. v. Continental Cas. Co., 273 Conn. 448 (2005). Nevertheless, "[t]here is general agreement among the courts to the effect that a liability insurer who undertakes the defense of a suit against its insured . . . may become liable to the insured, if that defense is conducted in an improper manner[.]" 34 A.L.R.3d 533, § 2[a]. There is a split of authority, however,

on the proper standard to apply in cases involving breach of an insurer's duty to defend its insured.  Some jurisdictions require an insurer only to conduct the defense of its insured in good faith, while other jurisdictions hold that an insurer must exercise reasonable care and skill in conducting the defense and thus may be liable for negligent conduct.  Id.; see also  United Services Automotive Ass'n v. Glens Falls Ins. Co., 350 F. Supp. 869, 871 (D. Conn. 1972) ("Some courts consider the relationship of an insurer to its insured to be a fiduciary one . . . and one which compels the insurer not only to defend but also to conduct an effective defense.") (citations omitted).

The Connecticut Supreme Court has stated that, "[w]hen a liability insurer undertakes to defend its insured, it 'has a continuing duty to use the degree of care and diligence a person would exercise in the management of his or her own business.'"  Hutchinson v. Farm Family Casualty Ins. Co., 273 Conn. 33, 47 (2005) (citing Liberty Mutual Fire Ins. Co. v. Kaufman, 885 So.2d 905, 908 (Fla. App. 2004)); see also Cambridge Mutual Fire Ins. v. Bemis, No. 074007914, 2008 WL 5156448, at *3 (Conn. Super. Ct. Nov. 13, 2008).  In Connecticut, a showing of bad faith is not required to establish a cause of action for breach of an insurer's duty to defend.  See Knudsen v. Hartford Accident and Indem. Co., 26 Conn. Supp. 325, 328 (Conn. C.P. 1966) ("'We know of no other situation where a negligent act proximately resulting in damages to another requires that there must have been bad faith also in order to give rise to a cause of action.  They constitute different concepts. . . . [E]ither may exist without the other.'") (quoting Waters v. American Casualty Co., 261 Ala. 252, 258 (1954)).  The foregoing authorities indicate that Connecticut has

adopted a negligence standard to determine whether an insurer has breached its duty to defend its insured.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384 (1994) (citation omitted). Generally, "[d]uty is a legal conclusion about relationships between individuals. . . . The nature of the duty . . . [is] determined by the circumstances surrounding the conduct of the individual." Id. at 385. Nevertheless, "[s]ummary judgment procedure is especially ill-adapted to negligence cases, where . . . the ultimate issue in contention requires the trier of fact to determine whether the standard of care was met in a specific situation." Michaud v. Gurney, 168 Conn. 431, 434 (1975) (citation omitted, internal quotation mark omitted).

### 1. Duty

Hartford had a duty to defend Windmill in the Rystedt action pursuant to the insurance policy issued to Windmill, which states, in relevant part: "We have the right and duty to defend any 'insured' against a 'suit' asking for . . . damages." [Ex. A, 2HFIC2703.]

### 2. Breach

Windmill claims that Hartford breached its duty to defend in failing to identify HVT as a potential defendant, and ultimately in settling the Rystedt action when Hartford was aware that Windmill adamantly opposed settling. Hartford, on the other hand, contends that DeRossi acted appropriately given the circumstances of the case, and further that Windmill has not presented evidence sufficient to

17

demonstrate that DeRossi's actions in preparing for the Rystedt litigation were unreasonable.

DeRossi testified in his deposition that it was a "standard practice to determine who owned the motor vehicles that were involved in [automobile liability claims]." [Doc. #32-28, p. 23.] Windmill contends that by failing to confirm the owner of Morris's vehicle via the DMV computer located in Hartford's offices, DeRossi was negligent in preparing Windmill's defense. DeRossi also testified, however, that the police report is one method Hartford claims personnel typically use to determine the owner of a vehicle involved in an accident. [Doc. #32-28, p.22.] Furthermore, in his supplemental affidavit submitted with the Defendant's Reply in support of summary judgment, DeRossi stated that it was his experience that 99% of the time the registrant of a motor vehicle is also the owner. [DeRossi Supp. Aff. ¶ 4.]

Windmill further asserts that, by acknowledging that the registrant is not the owner in every case, DeRossi all but admitted to acting negligently when he received the Rystedt claim. Alternatively, Windmill claims that, with its expertise, Hartford knew or at least should have known that the registrant of a motor vehicle in New York is not necessarily the owner. Nevertheless, DeRossi further stated that he has relied on the registrant also being the owner of a vehicle consistently over his 21-year career, and when he has a police report clearly indicating the registrant of the vehicle involved in an accident, it was not his standard practice to confirm the owner by reviewing the DMV records. [DeRossi Aff. ¶ 4.] The record is devoid of

any evidence showing what insurance adjusters generally do to identify or confirm the owner of a vehicle.

Thus, Windmill contends it was unreasonable for DeRossi not to verify the owner by checking DMV records in light of the vicarious liability statute in New York, whereas Hartford claims that it was not a "standard practice" for DeRossi to have done so when he had a police report identifying the registrant of the vehicle. While there is no evidence in the record of what steps claims adjusters generally take to ascertain the actual owners of cars involved in accidents covered by their policies, the accessibility of DMV records from Hartford's own offices suggest that it might be standard practice to verify vehicle ownership by checking DMV records, particularly given the prevalence of vehicle leasing. Therefore, there is a question as to whether DeRossi acted in accordance with standard procedure during his initial investigation by relying upon the police report rather than confirming the owner of the vehicle through DMV records.

However, this question does not raise an issue of material fact, because Windmill cannot show that Hartford breached its duty to defend based upon DeRossi's failure to immediately ascertain that Morris's car was leased and that HVT was the actual owner. The accident occurred on June 17, 2005, and Hartford learned of it on July 5, 2005. DeRossi was assigned to adjust the claim shortly thereafter. During his initial investigation, DeRossi obtained a police report which listed Morris as the registrant of the vehicle involved in the accident, and which did not indicate that the vehicle was leased. DeRossi did not immediately confirm that Morris was the owner by checking DMV records, as Windmill claims he should have

done.  However, at the time that DeRossi was conducting his initial investigation, the Graves Amendment had not been enacted, nor is there any evidence in the record indicating that DeRossi knew that the Graves Amendment was being considered by the legislature or would be enacted.  Prior to enactment of the Graves Amendment, under New York Vehicle and Traffic Law § 388 a lessor, as the owner of a vehicle, could be sued and held vicariously liable for injuries resulting from negligence by the lessee.  Therefore, DeRossi had no way of knowing that it was exigent for him to confirm that Morris was in fact the owner of the vehicle involved in the accident with Rystedt.

Rystedt filed suit against Morris and the Windmill Defendants on August 9, 2010.  The Graves Amendment was enacted one day later, on August 10, 2010.  On August 16, 2010, a mere seven days after suit was filed against the Windmill Defendants and little more than two months after the accident, DeRossi ascertained from GEICO, Morris's liability carrier, that the vehicle was in fact owned by HVT and leased to Morris.  In addition, Hartford promptly hired an attorney to represent the Windmill Defendants in the Rystedt action, and relied upon the advice of counsel in ultimately settling the case. There is no evidence in the record that Hartford was negligent in retaining an attorney.  Hartford's attorney successfully petitioned Rystedt's counsel to add HVT as a party defendant in an amended complaint dated December 18, 2006.  However, HVT was subsequently dismissed from the case by the trial court.  While Hartford's attorney appealed that dismissal, the trial court restored the case to the trial calendar for early February 2008, and the Appellate Division, Second Department refused to stay the trial pending the outcome of the

appeal.  Therefore, Hartford did not have the opportunity to await a final verdict as to whether HVT could be sued as a defendant in the Rystedt action at the time it decided to settle on the eve of trial on February 4, 2008.  Based upon these facts, there is insufficient evidence of any negligence by DeRossi in adjusting the claim and ascertaining the true owner of the vehicle.  Windmill's argument suggests that DeRossi and Hartford should have been prescient in predicting the legislature's enactment of the Graves Amendment on August 10, 2005, and also in predicting the ultimate holding of the Court of Appeals in the <u>Jones v Bill</u> decision.  Such a requirement is not reasonable as a matter of law.  Therefore, Hartford is entitled to summary judgment as to Windmill's claim that Hartford breached its duty to defend by failing to identify HTV as a potential defendant at the outset of the claims process.

### 3. Causation

The next issue is whether Hartford's failure to identify HTV as a potential defendant at the outset of the claims process and failure to obtain Morris's cell phone records for the date of the accident caused Windmill any harm.  Windmill contends that, had DeRossi discovered that Morris's car was in fact owned by HVT and provided that information to Rystedt's counsel, Rystedt's counsel would have certainly named HVT as a defendant when he commenced suit on August 9, 2005, thereby obviating the Graves Amendment issue.  Windmill contends that Rystedt's counsel was seeking a "deep pocket" to hold liable for the injuries Rystedt sustained during the accident.  Hartford contests HVT's status as a potential "deep

pocket" that might have served to limit the joint and several liability risk to Windmill in the Rystedt action.

Individuals working for Hartford referred to HVT as a "deep pocket" on a number of occasions throughout the pendency of the Rystedt action, seemingly in agreement with Windmill's evaluation of HVT's financial status.  [See Ex. 23 at 2HFIC0201 (DeRossi); Ex. N at 2HFIC1816 (Saville).]  In addition, Hartford was aware of Rystedt's goal to find a "deep pocket" defendant.  In his pre-trial report, Saville indicated to DeRossi that in settlement discussions, Rystedt's counsel stated he would "certainly be looking more towards [HVT] for a greater contribution which would then decrease any settlement amount [Hartford] would have to contribute" should HVT become a viable defendant.  [Ex. N at 2HFIC1821.]  However, while the parties appear to have been operating under the assumption that HVT was a "deep pocket" for purposes of the Rystedt action, there is no indication in the record that any party actually investigated HVT's financial capacity to pay a judgment or ascertained whether HVT was adequately insured.  Thus, there is no factual support for Windmill's contention that HVT could in fact pay a judgment against it.

Nevertheless, even assuming that HVT was a viable "deep pocket," there is no evidence in the record establishing that Rystedt's counsel would have named HVT as a defendant in the original action had he known about HVT's ownership of Morris's vehicle at the outset.  Rystedt's counsel learned that Morris's vehicle was leased on September 27, 2005 when he received Morris's answer to the Rystedt complaint in which she denied owning the vehicle involved in the accident but admitted that she was the lessee.  [Doc. #32-30.]  Morris also testified to the same

effect in her deposition on February 2, 2006. [Doc. #32-9 at 29.] Yet, even though Rystedt's counsel was made aware that Morris did not own her vehicle less than two months after the initial complaint was filed, and again several months later, he did not amend the complaint until December 2006, nearly a year and a half after the initial complaint, and only after Hartford's litigation counsel, Saville, conducted a legal analysis and asked him to name the previously known owner of the vehicle as a defendant. Although Rystedt's counsel promptly amended the complaint after Hartford's counsel asked him to name HVT as a defendant, there is no evidence in the record of when Rystedt's counsel learned that HVT was the owner or why he did not name HVT in the initial complaint. Windmill's assertion that had DeRossi known sooner, Rystedt's counsel would have acted differently is pure conjecture not supported by the facts before the Court and indeed inapposite to the record of this case. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotation marks omitted); Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment ."). Accordingly, there is no question of material fact as to whether Hartford's failure to identify HVT as a potential defendant prior to Rystedt filing suit caused Windmill any harm, which renders summary judgment appropriate with regard to this portion of Windmill's claim.

Regarding the failure of Hartford to delay settlement of the case until it had reviewed Morris's cell phone records, Windmill has failed to present any evidence that the cell phone records would have helped the defense in the Rystedt action and that Hartford's failure to obtain the records prior to settling caused Windmill any harm. In fact, all the evidence in the record suggests that Morris's cell phone records would have supported Hartford's conclusion that Morris was not using her phone at the time of the accident. The only evidence in the record that relates to Morris's use of her cell phone, Morris's deposition, demonstrates that Morris testified that she had but was not using her cell phone at the time of the accident. [Ex. F at 2HFIC2301-02.] In addition, the case was scheduled for trial in early February 2008 and settled on February 4, 2008. There is no evidence in the record that the cell phone records could have been secured prior to trial. As such, Hartford is also entitled to summary judgment as to the claim that failing to obtain Morris's cell phone records prior to settling was a breach of Hartford's duty to defend Windmill.

### 4. Injury

As explained above, Hartford is entitled to summary judgment as to Windmill's claim for breach of the duty to defend because Windmill cannot demonstrate the elements of breach and causation. Therefore, the Court need not address Windmill's damages contentions. Although the Court need not consider the parties' arguments with respect to damages, the Court will nonetheless do so in the interest of completeness.

Windmill contends that had Hartford identified HVT as a potential defendant at the outset of its investigation of the claim and ensured that HVT was included in Rystedt's initial complaint, there would have been no concern over the potential for joint and several liability, and thus no reason to consider settling the action. Further, Windmill contends that it was likely to obtain a complete defense verdict had the Rystedt action continued to trial. Accordingly, Windmill believes it would not have been liable for any amount of damages, and is thus entitled to damages of the full settlement amount and claims handling fee. Hartford asserts two issues with regard to Windmill's damages contentions: first, it is not clear that a jury in the Rystedt action would have delivered a complete defense verdict in favor of Windmill had HVT been a defendant; and second, if Windmill were guaranteed a defense verdict, nothing Hartford did in failing to identify HVT as a defendant impacted that outcome.

With regard to Hartford's first argument, although the record does support the assumption that a jury would likely have found Morris significantly at fault for the accident, it is unlikely a jury would have determined that Windmill had no liability whatsoever. First, Bonifati believed that Rystedt was a very sympathetic plaintiff and would have made a good witness, while Morris and Rodriguez would likely not make good witnesses at trial. Secondly, there was conflicting witness testimony about how the accident transpired and the extent to which Windmill's truck was involved in Morris losing control over her vehicle. Moreover, the police report of the incident indicated that the Windmill truck had cut off Morris at the intersection. Third, although the loss arbitration results likely would not have been admissible in

the Rystedt trial, DeRossi was aware that the arbitration proceeding had attributed fifty percent of the fault in the accident to the Windmill Defendants. Finally, because of the sympathetic plaintiff, the conflicting witnesses, the negative police report, and the arbitration results, Hartford's counsel reported that, even with the positive report he obtained from the accident reconstruction expert, the Windmill Defendants were not likely to obtain a complete defense verdict.

Hartford further asserts that Windmill has failed to present a triable issue of fact regarding the amount of damages it suffered by failing to disclose an expert to testify as to how and when the Rystedt action would have proceeded to trial and its likely outcome, how the <u>Jones v. Bill</u> case appeared to be proceeding at the time of the settlement, and the standard of care of an insurance adjuster as it applies to DeRossi's actions. Windmill contends, however, that an expert is unnecessary to show that Hartford acted unreasonably in investigating and defending the claim because the underlying case was a simple traffic accident, which is well within the understanding of a typical juror. <u>See</u> <u>Kulak v. Nationwide Mut. Ins. Co.</u>, 40 N.Y.2d 140, 147 (1976). Windmill's argument is persuasive solely as it relates to a jury's ability to assess fault for the accident. It is within the province of a jury to draw inferences and conclusions as to the evidence presented in a given case, and there is nothing in the record to suggest that jurors would need professional or scientific knowledge or skill not within the range of ordinary training or intelligence to evaluate the underlying action here. However, prudent claims adjustment and processing, trial strategy, and judicial case management are not within the knowledge of the average juror. Therefore, Windmill's failure to provide expert

testimony bearing on these issues is fatal to its claim.  See LePage v. Horne, 262 Conn. 116, 125 (2002) ("Expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors."); see also, Montagnon v. Pfizer, 584 F. Supp. 2d 459, 463-64 (D. Conn. 2008) (granting summary judgment to defendant because plaintiff failed to proffer expert witness testimony).

Hartford further contends that if Windmill were guaranteed a defense verdict in the Rystedt action, Hartford's failure to discover HVT's ownership of the vehicle and potential liability would have no impact on the outcome if the Windmill Defendants were absolved of liability.  This argument is unpersuasive. Ultimately, the amount of damages Windmill allegedly suffered as a result of Hartford's failing to identify HVT as the owner of Morris's vehicle and a potential defendant and settling the Rystedt action for approximately two-thirds of the settlement demand depends on the liability to which Windmill was exposed in that case, particularly in light of the evidence that Morris and the Windmill Defendants were equally at fault and the fact that Morris had only $100,000 of insurance coverage.  Saville's pre-trial report valued the potential jury verdict in the range of $450,000 to $650,000. Assuming an equal apportionment of liability between the Windmill Defendants and Morris, Windmill's exposure was in the range of $225,000 to $325,000.  Rystedt's initial settlement demand was $300,000, with a $200,000 contribution from Hartford. However, Hartford ultimately settled the case for $225,000, at the low end of the exposure range assessed by its attorney.  Assuming an equal apportionment of liability between Hartford and Morris, had it accepted Rystedt's initial demand

Hartford could have agreed to pay $150,000 to settle the case absent the need to make up for Morris's policy limit of $100,000. Windmill would have been obligated to pay the $25,000 claims handling fee regardless of the outcome of the Rystedt action. Therefore, on the record before the Court, the total amount of damages that Windmill could obtain against Hartford for breach of the duty to defend would be $75,000. However, because Windmill cannot prove breach and causation and because there are no facts to support Windmill's contention that the jury would have rendered a defendant's verdict in the Rystedt action, there is no triable claim for breach of duty to defend for a jury to consider in this case.

## D. Bad Faith (Second Cause of Action)

In its Second Cause of Action, Windmill claims that, by settling the Rystedt case for an amount within Windmill's prefunded deductible when Windmill believed there was a good chance to obtain a defendant's verdict, Hartford acted in contravention of Windmill's interests and in bad faith. On the other hand, Hartford contends that settling the Rystedt action was reasonable because a defense verdict for the Windmill Defendants was not certain, and that the settlement was, in fact, in the best interest of Windmill. Windmill has failed to present sufficient evidence on which a trier of fact reasonably could conclude that Hartford's decision to settle was in bad faith. Accordingly, summary judgment is entered for Hartford as to Windmill's bad faith claim.

Under Connecticut law, "[i]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship . . . . [E]very contract carries an implied duty 'requiring that neither party do anything that

28

will injure the right of the other to receive the benefits of the agreement.'" De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432 (2004). This implied covenant of good faith and fair dealing is applicable to contracts of insurance. See Verrastro v. Middlesex Ins. Co., 207 Conn. 179, 190 (1988). Moreover, Connecticut courts recognize "an independent cause of action in tort arising from an insurer's common law duty of good faith." Buckman v. People Express, Inc., 205 Conn. 166, 170 (1987).

"Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another . . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." Hutchinson v. Farm Family Casualty Ins. Co., 273 Conn. 33, 43 n.4 (2005). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004).

"The basis for judicial imposition on liability insurers of a duty to exercise good faith or due care with respect to opportunities to settle within policy limits is that the company has exclusive control over the decision concerning settlement within policy coverage, and company and insured often have conflicting interests as to whether settlement should be made." Bourget v. Gov't Employees Ins. Co., 456

F.2d 282, 285 (2d Cir. 1972) (internal quotation marks omitted).  Yet, "[b]ad faith arises only when [an] insurer acts without [a] reasonable basis."  Hutchinson v. Farm Family Casualty Ins. Co., 273 Conn. 33, 45 (2005) (citing Deese v. State Farm Mutual Automobile Ins. Co., 168 Ariz. 337, 340 (1991)).  Finally, "[i]n determining whether to accept or reject an offer of compromise, the insurer not only may consider its own interests but also must equally respect the insured's interests.  If it fails to exercise good faith or due care in its consideration of an offer of settlement, the insurer may be held liable under causes of action which sound in tort or contract, or both."  United Services Automotive Ass'n v. Glens Falls Ins. Co., 350 F. Supp. 869, 871 (D. Conn. 1972).

    To begin, there is no doubt that the policy between Windmill and Hartford empowered Hartford to settle Rystedt's claim, even without Windmill's consent.  The policy provides that Hartford "may investigate and settle any claim or 'suit' as [it] consider[s] appropriate."  [Ex. A. at 2HFIC2702.]  This power to settle any claims is not conditioned on Windmill's consent or approval.  It does not, however, excuse Hartford from exercising good faith in considering any settlement offers.

    In making the decision to settle the Rystedt action, DeRossi considered numerous factors, which ultimately led him to the conclusion that the settlement constituted a fair and reasonable resolution of the case.  First, Bonifati believed Rystedt was a sympathetic plaintiff and would have made a good witness, while Morris and Rodriguez would likely not make good witnesses at trial.  Secondly, there was conflicting witness testimony about how the accident transpired and the extent to which the Windmill truck was involved in Morris losing control over her

car. Moreover, the police report of the incident indicated that the Windmill truck had cut off Morris at the intersection. Third, although the loss arbitration results likely would not have been admissible in the Rystedt trial, DeRossi was aware that the arbitration proceeding had attributed fifty percent of the fault in the accident to the Windmill Defendants. Finally, because of the sympathetic plaintiff, the conflicting witnesses, the negative police report, and the arbitration results, Hartford's counsel reported that, even with the positive report he obtained from the accident reconstruction expert, the Windmill Defendants were not likely to obtain a complete defense verdict.

DeRossi also knew that Rystedt had been pinned under Morris's car, incurred over $58,000 in damages, underwent knee surgery, endured a long hospitalization, and suffered a permanent disability as a result of the accident. The case was valued at $450,000 to $650,000, and Rystedt offered to settle the case against Windmill for $225,000, fifty percent of the low value of the case. Moreover, DeRossi knew the trial was going to proceed before the HVT dismissal could be resolved, that the issue on appeal was one of first impression, and therefore that a reversal could not be assured. By settling the case on the eve of trial for a fraction of the case's value, DeRossi avoided the uncertainty of trial for less than Windmill's prepaid deductible. Furthermore, Windmill's contention that it was clear that the Court of Appeals would definitely reverse the Appellate Division, Second Department's decision in <u>Jones v. Bill</u> is speculative and factually unfounded and, in any event, Hartford did not have the option to postpone settlement discussions or the trial until the <u>Jones v. Bill</u> case was decided by the Court of Appeals.

The good faith requirement is ordinarily imposed to protect an insured from an insurer's refusal to settle within the policy limit, thereby putting the insured's personal assets at peril rather than to hold an insurer liable for obtaining a settlement within the policy limits.  See Bourget v. Gov't Employees Ins. Co., 456 F.2d 282 (2d Cir 1972), Knudsen v. Hartford Accident and Indem. Co., 26 Conn. Supp. 325 (Conn. C.P. 1966), Hoyt v. Factory Mut. Liab. Ins. Co. of America, 120 Conn. 156 (1935).  Here, Hartford's decision to enter a settlement within the deductible amount of its insured, rather than exposing its insured and itself to a potentially higher judgment was not unreasonable.  Windmill cites no particularized facts to support a claim of bad faith.  In light of the record in this case, which is replete with reasons for the settlement decision, there is no genuine issue of material fact as to whether Hartford acted in bad faith.

In deciding to settle, Hartford was allowed to consider its own interests as long as that consideration was not at the expense of Windmill's interests.  Given the facts and the procedural posture of the Rystedt action, Windmill has failed to establish facts on which a jury could determine that Hartford acted after solely considering its own interests at the expense of Windmill's interests.  Accordingly, Windmill has failed to establish a triable issue of material fact as to Hartford's bad faith.  Summary judgment is therefore entered in favor of Hartford with regard to the bad faith claim.

## IV. CONCLUSION

Based upon the above reasoning, Hartford's motion for summary judgment [Doc. #27] is GRANTED, and Windmill's cross-motion for summary judgment [Doc.

#35] is DENIED.  The Clerk is directed to enter judgment for the Defendant, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford Connecticut:  September 24, 2010.